GEORGE A. GOVEDNIK, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Govednik v. Commissioner
Docket No. 30454-84.
United States Tax Court
T.C. Memo 1988-578; 1988 Tax Ct. Memo LEXIS 607; 56 T.C.M. (CCH) 910; T.C.M. (RIA) 88578; December 27, 1988. Alvin S. Michaelson and Steven E. Trytten, for the petitioner. Irene Scott Carroll, for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined deficiencies in petitioner's Federal income tax as follows: Additions to Tax
Year
Deficiency
sec. 6653(a)(1)
sec. 6653(a)(2)
sec. 6653(b)(1)
1982
$ 851,151
$425,576
1983
$ 849,615
$ 42,481
*
Year
sec. 6653(b)(2)
sec. 6654
1982
*
$ 78,719
1983
$ 51,989
Petitioner did not file a timely Tax Court *608 petition for the 1982 taxable year and, thus, that year is dismissed due to a lack of jurisdiction. [1] Petitioner has conceded the applicability of section 6654 [2] to any deficiency. The issues remaining for our decision are (1) the amount of income petitioner received in 1983 from an illegal drug operation and (2) whether petitioner is liable for an addition to tax in 1983 under sections 6653(a)(1) and 6653(a)(2). FINDINGS OF FACT Many of the facts were stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. At the time the petition was filed, petitioner was in prison in Los Angeles, California. Petitioner attended and graduated from the University of California at Los Angeles *609 in 1974 with a degree in zoology. He was a chemical engineer at Spraylat Corporation in Los Angeles from 1974 to 1979. Petitioner, who had a pilot's license and a flight instructor's certificate, became a co-owner of Skyline Aviation (Aviation) at Van Nuys Airport, California in 1979. Aviation provided air taxi service, rental of aircraft to private pilots, flight lessons for new and continuing student pilots and a brokerage service for purchases of new and used aircraft. In 1979, petitioner met Robert L. Graff (Graff) who provided Aviation with an insurance package. In 1980, Aviation suffered several financial setbacks, and petitioner was unable to pay all of his bills. At this time, Graff introduced petitioner to Danny Apple (Apple) who hired petitioner as a pilot for his plane. Knowing of petitioner's background as a chemist, Apple told petitioner that he would pay him $ 10,000 for a recipe for methaqualone, a controlled substance. Petitioner made a photocopy of such a recipe from a book at the library and gave it to Apple. Apple paid $ 1,000 to petitioner and stated that he would pay the remainder of the money if the recipe worked. Shortly thereafter, petitioner had meetings *610 with other individuals regarding the recipe. Graff was present at most of these meetings. At these meetings, petitioner was told that the recipe did not work. Before long, petitioner was flown to North Carolina where he was taken to a small methaqualone lab designed to manufacture quaalude pills. Petitioner was told to make the recipe work. He did this, was paid $ 1,000, and was flown back to California. Later he was flown back to North Carolina to observe the operation of the lab for several days. Again in 1981, he took his third, and last, trip to North Carolina. During this trip, he determined that the lab was operating properly and was given the remainder of the $ 10,000. He was told that he had better not be around to testify if the lab was discovered by the authorities. In late February 1982, the illegal methaqualone lab in North Carolina was discovered by the authorities. On April 13, 1982, petitioner was indicted by the State of North Carolina on two counts of Conspiracy to Traffic in a Controlled Substance (Methaqualone) during the period January 1, 1981 to February 28, 1982. An order for his arrest was issued that day. Graff suggested to petitioner that he *611 leave the country until things quieted down. Graff paid petitioner $ 5,000 and a round trip air ticket to France in return for help at an illegal methaqualone laboratory that Graff had established at 9525 Cozycroft Avenue, Chatsworth, California (the Cozycroft property). The Cozycroft property had been leased in early February 1982, under the name of "Bob Graff, G & B Sales Co." Petitioner arrived in Paris on June 19, 1982. Later, petitioner travelled to Germany. During most of his time in Europe, petitioner stayed with friends. Subsequently, on November 25, 1982, petitioner flew to South America to stay with an aunt. In late December 1982 or early January 1983, he met Graff in Mexico and they drove back to the United States. Upon returning from Europe, petitioner took up residence in an apartment on Victory Boulevard in Canoga Park, California (the Victory apartment). This apartment had been rented by Graff, and Graff's name was on the mailbox. While living there, petitioner assisted Graff a number of times at the Cozycroft property. Each time he was paid between $ 1,000 and $ 5,000. Petitioner also applied for and received a Texas driver's license under an assumed name.
*612 Graff and petitioner spent a great deal of time together during 1983, both on business and to socialize. On several social occasions they used two jet skis which petitioner had bought for himself and Graff at a cost of approximately $ 5,000. Petitioner and Graff also had a mutual interest in airplanes, with petitioner holding a multi-engine license and Graff holding a single-engine license. Petitioner accompanied Graff when Graff paid $ 50,000 for an aircraft on September 9, 1983. Petitioner also accompanied Graff when Graff made various purchases involving the plane. The application for insurance on Graff's plane listed petitioner's assumed name as the pilot. Graff and petitioner also together purchased cellular phones for their cars. Petitioner and Graff were placed under arrest by Los Angeles Police Department detectives on December 5, 1983. At the time of petitioner's arrest, the police recovered $ 3,295 in cash from him. They also found a loaded gun in the glove compartment of his car and a briefcase in his car with another loaded gun and some cocaine. The police also found 13.1 grams of cocaine at the Victory apartment. On December 3, 1984, petitioner and Graff pled *613 guilty to violations of the California Health and Safety Code relating to the manufacture of methaqualone, the possession for sale of methaqualone and the possession of cocaine. On January 16, 1985, petitioner was sentenced to a term of 2 years imprisonment with credit for 613 days served. Petitioner also was sentenced in North Carolina. Petitioner and respondent agree that $ 5,634,936.72 of net income was produced by the manufacture of illegal quaalude tablets at the Cozycroft location during 1982 and 1983. Petitioner did not file Federal income tax returns for the 1981, 1982 or 1983 years. OPINION The burden of proof is on petitioner. Rule 142(a); . Respondent calculated the tax for petitioner's 1983 taxable year by allocating half of the income from the drug operation to each of the years 1982 and 1983 and by equally dividing each year's income between petitioner and Graff. This allocation was done by a revenue agent who assumed that there would be a 50/50 split of the net income between petitioner and Graff. [3]
*614 We are convinced that petitioner was a part-time employee or consultant rather than a partner in the illegal methaqualone operation and, thus, that there was not a 50/50 split of income. There are a number of factors which courts consider when deciding upon the existence of a partnership. Those relevant here are (1) the contributions of the parties to the activity, (2) whether the parties had a mutual proprietary interest in the profits, (3) whether the parties represented to others that they were partners, and (4) whether the parties exercised mutual control over and assumed mutual responsibilities for the enterprise. See . Each of these factors will be considered separately. Contributions of Parties to the Activity
The record indicates that petitioner did not contribute any funds to the establishment or operation of the Cozycroft drug operation. When he got involved in the drug operations, he was having financial problems and needed money. He had no funds of his own to invest in the Cozycroft operation. All expenses of the activity, such as the rent on the Cozycroft location, were paid by Graff. *615 The record also indicates that petitioner's services were provided as an employee, not as a partner. He received payment each time he contributed services, which is inconsistent with a role as partner. For example, petitioner first assisted Graff at the Cozycroft location in June 1982, and in return received $ 5,000 and an airline ticket to Europe. Petitioner was in Europe during the second half of 1982 and clearly had no involvement with the drug operation during that time. His absence from the country is inconsistent with an active partnership role furnishing services in the drug operation. Interest in Profits
Petitioner would have accumulated great wealth if he had been an equal partner in the activity. However, the only assets that he owned at the time of his arrest were a 7-year old Cadillac and two jet skis (with trailer). He was unable to post any bond during his criminal proceedings and was forced to borrow from family members to pay for his criminal defense. These facts support the conclusion that petitioner was not a partner. Respondent suggests that petitioner had no assets because he spent his income on cocaine. Indeed, petitioner admitted that he used *616 cocaine on occasion, and cocaine was found in a briefcase in his car and in the apartment he occupied. However, we believe petitioner's testimony that he was not a heavy cocaine user. Respondent also points out that petitioner testified that he expected Graff to pay for his criminal attorney. This testimony suggests, however, that Graff and petitioner were not partners. If they were partners, petitioner would have had a right to half of the profits and would not have been dependent upon Graff's generosity when he needed money. Respondent also implies that some assets held in Graff's name, such as the plane, were in fact owned by petitioner. To support this argument, respondent points out that petitioner's assumed name was listed as the pilot on the insurance application for the plane, and that Graff, with his single-engine rating, could not fly the plane, which apparently had two engines. However, title to the plane always was in Graff's name, and Graff was going to repaint the plane in his own colors. We conclude that Graff, not petitioner, owned the plane. Representations to Others
The Cozycroft location was rented in the name of "Bob Graff, G & B Sales." Other documents *617 discovered at the Cozycroft location were in the names of "Bob Jorgenson, G & B Sales," and "Bob Graham, G & B Sales." Respondent suggests that the initials "G & B" refer to the first names of petitioner (George) and Graff (Bob). However, they also could refer to Graff's last and first names or might not stand for anything at all. We attach little weight to the name that Graff gave to the activity. Aside from the name of the activity, there is no evidence that petitioner was represented to others as being a partner in the activity. It was always Graff's name (or an alias of his), never petitioner's name, that appeared on the various documents related to the activity, such as the lease on the Cozycroft property. Respondent points out that petitioner and Graff socialized together, but this hardly means that they were business partners. Respondent also points out that petitioner and Graff were together when Graff purchased the plane and when work was done on the plane. However, it is hardly surprising that friends with a mutual interest in aviation would be together when one of them purchased a plane. In any event this alone does not create a partnership. Mutual Control and *618 Responsibilities
The evidence is that Graff, not petitioner, controlled and was responsible for the activity. Petitioner merely assisted Graff in the activity. No Partnership Existed
We conclude that petitioner was not a partner in the activity. However, he must be taxed on the compensation he received in 1983 for his services. Petitioner testified that Graff paid him between $ 1,000 and $ 5,000 each time that he assisted Graff, for a total of $ 45,000 to $ 60,000 in 1983. Graff also provided petitioner with an apartment. Given that petitioner has an incentive to minimize his estimate of his income, we hold that he received a compensation of $ 106,000 from Graff in 1983. Petitioner states that income averaging should be used to determine his 1983 deficiency and, thus, that we must determine his 1982 taxable income. However, we cannot use income averaging for 1983 unless we are able to determine petitioner's correct taxable income for each of the base period years of 1979 through 1982. Sections 1301-1305; . As noted above, the record indicates that petitioner's 1982 drug income consisted of several payments *619 as a part-time employee or consultant. However, petitioner has failed to establish his correct taxable income for the years 1979 through 1981. Thus, he has not carried his burden of proof, and we are unable to use income averaging when calculating his 1983 deficiency. See , affd. without published opinion . Section 6653
Respondent has determined additions to tax under sections 6653(a)(1) and 6653(a)(2). Those sections provide for additions to tax in the case of an underpayment of tax that is "due to negligence or disregard of rules or regulations." Petitioner neither filed a return nor paid any tax during 1983, so the requirements of these sections would appear to be satisfied. Petitioner argues, however, that because there was a termination assessment in the instant case, the underpayment of tax was not due to his behavior and, thus, that the additions to tax should not apply. However, the existence of a termination assessment does not relieve petitioner from his obligation to file a return and pay tax. There is no doubt that he negligently or intentionally failed to file *620 a return and pay tax, and that an underpayment of tax resulted. Thus, he is liable for additions to tax under sections 6653(a)(1) and 6653(a)(2). Respondent's Motion to Dismiss for Lack of Jurisdiction and to Strike as to the Taxable Year 1982 is granted. Decision will be entered under Rule 155 for the 1983 taxable year.
Footnotes
*. 50% of interest on underpayment↩
1. On December 29, 1987, respondent filed a Motion to Dismiss for Lack of Jurisdiction and to Strike as to the Taxable Year 1982. On February 16, 1988, petitioner filed a Notice of No Objection to respondent's motion. ↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. This allocation was involved in , which concerned Robert Graff's liability for tax on income resulting from the Cozycroft operation.↩